IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNIVERSAL FURNITURE
INTERNATIONAL , INC.,

    Plaintiff,

v.

COLLEZIONE EUROPA USA, INC.,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)



Case No.: 1:04CV00977

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Universal Furniture International, Inc., pursuant to Fed. R. Civ. P. 65 and LR 7.2,

7.3, and 65.1, submits this brief in support of its Motion for Preliminary Injunction against Defendant

Collezione Europa USA, Inc.

## NATURE OF THE CASE AND STATEMENT OF THE FACTS

This is a copyright infringement action between competitors who manufacture and sell fine

home furnishings, but who approach that process in very different manners. See Declaration of

Stephen Giles ("Giles Decl.") at ¶¶ 3, 12. On one hand, Plaintiff Universal Furniture International,

Inc. ("Universal") expends substantial resources to create original and new furniture designs. Id. at ¶

14. In stark contrast, Defendant Collezione Europa USA, Inc. ("CEU") knocks off the furniture

styles and designs created by other companies, and then sells their competing knock-off collections at

lower prices. Id. at ¶ 12. This Court has previously held CEU liable for precisely such conduct. Id.

In this case, two of Universal's popular furniture collections, called "Grand Inheritance" and

"English Manor," have been the target of CEU's knock-off efforts. To date, Universal has paid

$940,000 to the High Point-based design firm Norman Hekler, Inc. ("Norman Hekler") to create

these two collections. Id. at ¶ 4. Consistent with that investment, Universal has applied for and

obtained from the United States Copyright Office copyright registrations, discussed below, that cover the ornamental design elements incorporated into these two collections, and that cover the original compilation and arrangement of such elements therein. Id. at ¶¶ 8, 10 and Universal Exhibits 6 and 7. The design features and ornamental arrangement of CEU's competing collections, however, are so strikingly and substantially similar to Universal's copyrighted works that it is evident that CEU has copied those works without Universal's authorization. Declaration of Thomas Moser ("Moser Decl.") at ¶ 32. Indeed, in the case of CEU's analogue to English Manor, CEU even displayed actual pieces of Universal's English Manor collection in CEU's showroom as a means of marketing CEU's competing collection. Giles Decl. at ¶ 15.

In order to produce new furniture designs that will be appealing to consumers, Universal contracts with outside furniture design specialists, such as Norman Hekler. Id. at ¶ 4. Compensating such designers for their work is a major expense to Universal. Id. Universal typically and primarily compensates design firms by paying royalties on Universal's sales of the designs that these firms create, and has done so in this case. Id. In addition, Universal also invests substantially in highly specialized computer hardware and software to handle the production and transmission of computerized design drawings that are used during the design and manufacturing process. Id. at ¶ 5. Universal also maintains an engineering and quality team in the United States and China to assist in the development of new products. Id.

In 2000, Universal retained Norman Hekler to create a new collection of dining room and bedroom furniture containing a complementary series of ornamental sculptures and carvings. See Declaration of Steven Russell ("Russell Decl.") at ¶ 5. This furniture collection came to be known as the "#474 Grand Inheritance collection." Id. Steven Russell at Norman Hekler was the principal designer of the Grand Inheritance collection. Id. at ¶ 5.

2

At the outset, Universal gave Norman Hekler broad aesthetic guidance to create a design that was new and original, yet that would appear to consumers to be traditional (i.e., dating from the Eighteenth or Nineteenth Century) and would have an ornate, opulent look. Id. at ¶ 6. In attempting to translate Universal's broad guidance into a specific furniture design, Mr. Russell made a number of creative design decisions, including the following:

- Reviewing a variety of public-domain sources, and – from among hundreds of examples of two-dimensional depictions of carved, ornamental design motifs in a variety of traditional design influences – selecting the designs to be included in the Grand Inheritance collection. Id. at ¶¶ 9-11;

- Experimenting with a number of ornamental and other elements, and arranging them in various combinations in drafts and sketches to assess their aesthetic impact, before settling on a final design. Id. at ¶ 10;

- Having the collection feature a large number of ornamental, carved motifs throughout its various pieces, including, for example, three-dimensional shells, acanthus leaves, columns, finials, and rosettes. Id. at ¶ 8;

- Not creating a period reproduction, but, instead, combining elements from a variety of different Eighteenth and Nineteenth Century design themes. Id. at ¶ 7;

- Selecting design elements from a variety of such influences, including Hepplewhite, Chippendale, Georgian, and Sheraton. Id.;

- Adapting the ornamental elements selected from two-dimensional source books, and adjusting them in a variety of ways to incorporate them into the overall Grand Inheritance design scheme. Id. at ¶ 13;

- Creating at least one original decorative element – the bedpost finial – without any specific public domain reference, and creating it in a manner that would hang together aesthetically with the rest of the Grand Inheritance collection. Id. at ¶ 14; and

- Attending to the aesthetic impression a particular element made when viewed individually, as well as the aesthetic impression each element made when viewed in combination with other elements that existed elsewhere on the same piece, on "nearby" pieces within the grouping, and on other pieces throughout the Grand Inheritance collection as a whole. Id. at ¶ 16.

3

This trial-and-error process of designing the Grand Inheritance collection continued for several weeks, including numerous redrafts and revisions. Id. at ¶ 11. There was nothing automatic about this process, with Mr. Russell employing his creative judgment, based on his training and more than thirty years of experience in furniture design. Id. at ¶ 12. Expert testimony confirms the creativity and skill with which Mr. Russell designed the Grand Inheritance collection. Moser Decl. at ¶¶ 10-15, 17-24.

The ornamental elements contained in the Grand Inheritance collection serve no functional purpose. Russell Decl. at ¶ 15. Instead, they are all purely decorative, and serve to ornament and adorn the furniture for purely aesthetic reasons. Id.

Pursuant to a written agreement between Universal and Norman Hekler, Universal became the owner of all rights in and to the Grand Inheritance designs upon Universal's acceptance and manufacture of the Grand Inheritance collection. Id. at ¶ 5. Universal has offered the Grand Inheritance collection for sale publicly since April 2001. Giles Decl. at ¶ 7.

Universal has applied for and obtained from the United States Copyright Office a copyright registration for the Grand Inheritance designs bearing registration number VA1-169-932 (the "'932 Registration"). Id. at ¶ 8 and Universal Exhibit 6. The nature of the work for which the Copyright Office issued the '932 Registration is "decorative sculptural designs on furniture." Universal Exhibit 6. The effective date of the '932 Registration is May 1, 2003. Giles Decl. at ¶ 8 and Universal Exhibit 6.

Universal has also obtained a supplementary copyright registration for the Grand Inheritance Designs, bearing registration number VA1-188-951 (the "'951 Registration"). Id. at ¶ 8 and Universal Exhibit 6. The '951 Registration amplifies the previously issued '932 Registration in several respects. In particular, the '951 Registration clarifies that the nature of the work is

4

"decorative sculptural designs on furniture; adaptation of preexisting decorative designs; compilation of decorative designs on suites of furniture." and that the Grand Inheritance Designs are derivative works and/or compilations of "public domain ornamental designs." Universal Exhibit 6. The effective date of the '951 Registration is July 3, 2003. Giles Decl. at ¶ 8 and Universal Exhibit 6.

Universal also engaged Norman Hekler to create another collection of bedroom and dining room furniture that came to be called the "#609 English Manor collection." Russell Decl. at ¶ 17. Mr. Russell was also the primary designer of the English Manor collection. Id.

The process used to create the designs for English Manor was highly similar to the process used in designing Grand Inheritance. Id. Mr. Russell started out with the broad idea of creating an original furniture design with a traditional appearance that would be aesthetically appealing to consumers who appreciate antiques. Id. at ¶ 18. To do so, Mr. Russell attempted to emulate certain Eighteenth and early Nineteenth-century English and American forms, focusing largely on Georgian design elements from that period. Id. Mr. Russell then took a number of creative steps, including reviewing a variety of public-domain sources, and – from among hundreds of examples of two-dimensional depictions of carved, ornamental design motifs in a variety of traditional design influences – selecting the designs to be included in the English Manor collection; selecting certain decorative elements that he thought would best express the aesthetic idea that he had for the collection; and adjusting and adapting the two-dimensional designs identified from the source books in a variety of ways to incorporate them into the overall English Manor design. Id. at ¶¶ 18-22. As with Grand Inheritance, there was nothing automatic about this design process, which took several months to complete, and expert testimony confirms the skill with which it was executed. Id. at ¶¶ 20-21; Moser Decl. at ¶¶ 16-24.

5

Pursuant to a written agreement between Universal and Norman Hekler, Universal became the owner of all rights in and to the English Manor designs upon Universal's acceptance and manufacture of the collection. Russell Decl. at ¶ 17. Universal has offered the English Manor collection for sale publicly since 2002. Giles Decl. at ¶ 9.

Universal has applied for and obtained from the United States Copyright Office a copyright registration for the English Manor designs bearing registration number VA1-227-506 (the "'506 Registration"). Id. at ¶ 10 and Universal Exhibit 7. The nature of the work for which the Copyright Office issued the '506 Registration is "[d]ecorative designs on furniture and compilation of such designs." Universal Exhibit 7. The effective date of the '506 Registration is November 14, 2003. Giles Decl. at ¶ 10 and Universal Exhibit 7.

In October 2004, Universal learned that CEU was displaying two furniture collections in CEU's showroom that appeared to be very close copies, if not exact duplicates, of Universal's English Manor and Grand Inheritance collections, and Universal's Senior Vice President of Merchandising, Stephen Giles, personally investigated the matter. Giles Decl. at ¶¶ 2, 13-14. Mr. Giles visited CEU's showroom, and took photographs of the furniture that was then being displayed. Id. at ¶ 14. Based on Mr. Giles's personal familiarity with the details of Universal's English Manor collection, and the production stickers of Lacquercraft (Universal's parent company) on the back of the furniture cases, it became clear that the furniture in CEU's showroom that looked like Universal's English Manor collection actually was English Manor. Id. at ¶ 15. In other words, rather than creating a design based on copying English Manor, CEU obtained actual pieces of English Manor and displayed those pieces in its showroom as if they were CEU's own furniture. Id.

6

During his October 2004 visit to CEU's showroom, Mr. Giles also noticed a second furniture collection that appeared strikingly similar to Grand Inheritance. Id. The photographs that Mr. Giles took at that time confirm his personal observations. Id. and Universal Exhibit 2.b.

Shortly thereafter, Universal's lawyers contacted CEU to object to CEU's display, distribution, and sale of these competing collections, which CEU calls the "20000 collection" (for CEU's knock-off of Grand Inheritance) and the "20200 collection" (for CEU's knock-off of English Manor). Giles Decl. at ¶ 16. Universal also filed this lawsuit against CEU on October 22, 2004, but did not immediately serve its Complaint pending CEU's response. Id.

In response, CEU agreed, without prejudice, not to market or sell its 20000 and 20200 collections while the parties, through counsel, engaged in settlement discussions in an effort to reach a satisfactory resolution. Id. at ¶ 17. Those settlement efforts continued for several months. However, in mid-March, 2005, Universal learned from seeing advertisements in the industry publication "Furniture Today" that CEU was once again marketing its knock-offs of Grand Inheritance and English Manor. Id. at ¶ 17 and Universal Exhibit 2.a. and 2.c. From late October 2004 until the time Universal saw the Furniture Today advertisements in mid-March 2005, Universal believed, based on statements made by CEU's attorney, that CEU had at least temporarily ceased distribution of its 20200 and 20000 collections. Giles Decl. at ¶ 17. CEU filed an Answer and Counterclaims in response to the Complaint on April 19, 2005.

CEU charges substantially less for its 20000 and 20200 lines than Universal charges for Grand Inheritance and English Manor, respectively. Id. at ¶ 18. Specifically, for its competing knock-offs, CEU charges $500 less than Universal's English Manor bedroom and $150 less than Universal's English Manor dining room furniture. Id. Such copying of Universal's designs, and CEU's corresponding conduct in the marketplace, threatens to weaken Universal's established

7

relationships with important customers.  Id.  The impact of that weakening will consist not only of sales directly lost to CEU, but also of the various kinds of concessions and accommodations that Universal is forced to make to keep its customers.  Id.

## QUESTION PRESENTED

Whether Universal is entitled to a preliminary injunction prohibiting CEU from further publicly displaying and offering for sale CEU's 20000 and 20200 knock-offs of Universal's Grand Inheritance and English Manor designs.

## ARGUMENT

### I.    Legal Standards for Granting a Preliminary Injunction

Section 502(a) of the Copyright Act. 17 U.S.C. § 502(a). authorizes a federal court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."[1]  In the Fourth Circuit, motions for a preliminary injunction are governed by the four-part test articulated in Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc. 550 F.2d 189 (4th Cir. 1977).  This standard requires the Court to consider "(1) the likelihood of irreparable harm to [Universal] if the preliminary injunction is denied, (2) the likelihood of harm to [CEU] if the requested relief is granted, (3) the likelihood that [Universal] will succeed on the merits, and (4) the public interest." Direx Israil, Ltd. v. Breakthrough Med. Corp. 952 F.2d 802, 812 (4th Cir. 1991).

Each of these factors  weighs strongly in favor of granting Universal's Motion.  Given the nature of Universal's claims (namely, claims for copyright infringement and, generally speaking, for unfair competition), and given the presumptions of irreparable injury that flow directly therefrom,

---

[1] Similarly, Lanham Act § 34(a) permits entry of preliminary injunctive relief for violations of that chapter.  See 15 U.S.C. § 1116(a).

Case 1:04-cv-00977-WO-PTS    Document 11    Filed 05/09/05    Page 8 of 21

Universal will commence with a discussion of the reasons why it is likely to succeed on the merits, and will subsequently address the remaining preliminary injunction factors.

## II.    Universal is Likely to Succeed on the Merits of its Claims

To prevail on its claim for copyright infringement, Universal must establish two elements: (1) *ownership* of valid copyrights, and (2) *copying* by the defendant. See, e.g., Bouchat v. Baltimore Ravens, Inc., 228 F.3d 489, 492 (4th Cir. 2000) (citing Towler v. Sayles, 76 F.3d 579, 581 (4th Cir. 1996)); see also Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361 (1991). Universal is likely to succeed in establishing both of these elements.

### A.    Universal Owns Valid Copyrights.

Universal has submitted copies of the certificates of registration for the copyrights in question. See Giles Decl. at ¶¶ 8, 10, and Universal Exhibits 6 and 7. These certificates of registration explicitly cover "decorative sculptural designs on furniture; adaptation of preexisting decorative designs; compilation of decorative designs on suites of furniture" for Grand Inheritance, Universal Exhibit 6; and "[d]ecorative designs on furniture and compilation of such designs" for English Manor, Universal Exhibit 7. Because Universal secured these copyright registrations within five years of the covered works' publication, Universal has established a presumption that it owns valid copyrights. See 17 U.S.C. § 410(c); see also Service & Training, Inc. v. Data General Corp., 963 F.2d 680, 688 (4th Cir. 1992).

CEU faces the burden of overcoming this presumption. To do so, CEU must establish, by the submission of evidence, that Universal's registered copyrights are invalid. See, e.g., Collezione Europa U.S.A., Inc. v. Hillsdale House, Ltd., 243 F.Supp.2d 444, 452 (M.D.N.C. 2003)("A certificate of registration in a copyright infringement action shifts the burden of proof to the party defending the infringement claim, who must produce evidence weighing against validity.") CEU

9

will fail to do so because the Copyright Office was clearly correct when it determined that the Grand Inheritance designs and the English Manor designs, and Universal's compilations thereof, are original works of authorship entitled to copyright protection.

          1.      The Grand Inheritance and English Manor designs are "original works."

"Originality" is the *sine qua non* of copyright. and copyright protection extends "to those components of the work that are original to the author." Feist, 499 U.S. at 347. Originality has two components: "[1] independent creation plus [2] a modicum of creativity." Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Company, Inc., 74 F.3d 488. 492 (4th Cir. 1996) (citing Feist, 499 U.S. at 346). In Feist. the United States Supreme Court observed:

> The requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude. humble or obvious' it might be.

Id. at 346 (citing 1 Nimmer on Copyright § 1.08[C][1]). Further, "originality does not signify [and is a far lower standard than] novelty [e.g., under design patent law]; a work may be original even though it closely resembles other works so as long as the similarity is fortuitous. not the result of copying." Feist, 499 U.S. at 345; see also M. Kramer Mfg. Co., Inc.. 783 F.2d 421, 438 (4th Cir. 1986)(describing the originality requirement as "minimal, . . . of a low threshold, . . . . modest at best, . . . a faint trace of originality.")(internal quotations and citations omitted); Baldine v. Furniture Comfort Corp.. 956 F. Supp. 580, 585 (M.D.N.C. 1996).

Applying Feist. the Fourth Circuit has stated that a work is copyrightable "as long as the work represents the author's creative effort," and further observed that "[s]everal sculptors may copy a deer, even the same deer, in creating a sculpture, and each may obtain copyright protection for his or her own expression of the original. . . . Such individual creative efforts inevitably possess some degree of originality." Superior Form Builders, 74 F.3d at 492.

10

Here, Universal's copyright registrations establish, *prima facie*, that the Grand Inheritance designs, and the English Manor designs, are copyrightable "original works of authorship." The evidence of Universal's designers' creativity in coming up with the Grand Inheritance and English Manor designs plainly establishes Universal's valid copyright interest in (a) the creative transformations and adaptations of decorative elements taken from public domain sources; and (b) certain original decorative elements created to emulate traditional styles. See Russell Decl. at ¶¶ 8-24; Moser Decl. at ¶¶ 10-24.

> 2. <u>Universal's compilations of individual decorative elements are also copyrightable "original works."</u>

An original compilation of preexisting works (which can either be copyrightable *or uncopyrightable*) is itself eligible for copyright protection if sufficient creative judgment was used in the process of compiling those works. The Copyright Act defines a copyrightable compilation as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101.

Many, but not all, of the decorative elements in the Grand Inheritance designs and English Manor designs are adapted from particular public domain references. Russell Decl. at ¶¶ 8-16. Recent case law confirms, however, that an original compilation arising from the selection, continuation. and modification of preexisting public domain design elements for inclusion in a new overall design is copyrightable. See, e.g.. Tufenkian Import/Export Ventures v. Einstein Moomjy, Inc.. 338 F.3d 127 (2nd Cir. 2003); Thimbleberries, Inc. v. C&F Enters., Inc.. 142 F. Supp.2d 1132 (D. Minn. 2001); Open Source Yogan Unity v. Choudhury. 2005 WL 756558 (N.D. Cal., April 1, 2005)(attached as Universal Exhibit 8 pursuant to LR 7.2(d).

The Second Circuit's <u>Tufenkian</u> decision is particularly instructive. That case involved an oriental carpet pattern. The pattern had been created by selecting a portion of a preexisting ornate public domain carpet design, selectively eliminating certain design motifs from that design, elongating the pattern somewhat, adding a major border from another public domain carpet design, and adding original minor borders. The Second Circuit held the new design was copyrightable, and further held that the defendant's carpet infringed the plaintiff's valid copyright, despite a different "overall concept and feel." In doing so, the Second Circuit said:

> The plaintiff seems to have engaged in a selective and particularized culling of a leaf here, a complex of leaves and flowers there, and so forth. And close visual inspection of the two rugs confirms that the Bromley precisely mimics the Heriz in nearly all of these choices.

338 F.3d at 136.

This process, which the <u>Tufenkian</u> court found to be both copyrightable and infringed, is very much akin to the process in which Universal's designers engaged when they created the Grand Inheritance and English Manor designs. <u>See</u> Russell Decl. at ¶¶ 8-24; Moser Decl. at ¶¶ 10-24. Furthermore, like the infringing pattern in <u>Tufenkian</u>, CEU's 20000 and 20200 collections "precisely mimic" Universal's original Grand Inheritance and English Manor works in a great number of discretionary creative choices.

> 3. <u>The Grand Inheritance and English Manor designs are conceptually separable from the furniture products on which they are displayed.</u>

CEU may also argue that the Grand Inheritance and English Manor designs are not copyrightable because they are incorporated into utilitarian works. CEU asserted this position unsuccessfully in the earlier <u>Collezione Europa v. Hillsdale House</u> case before this Court. CEU's argument would be as meritless now as it was then. Although the *functional* aspects of utilitarian articles (such as furniture) are not copyrightable, Congress made clear in enacting the 1976

12

Copyright Act that "conceptually separable" ornamental works that appear *on* useful articles, such as "a statue or carving [that] is used to embellish an industrial product," are copyrightable. H.R. Rep. No. 94-1476, 1976 U.S.C.C.A.N. 5667, 5668 (1976) (cited in Collezione, 243 F. Supp. at 454).

> Elements . . . which can be identified separately from the useful article as such are copyrightable. . . . (for example, a carving on the back of a chair or a floral relief design on silver flatware). . .

Id.

Applying these principles, Judge Osteen held that a triple-leaf design, featured in various places (including the backs of chairs) in a line of wrought-iron furniture, was conceptually separable from the pieces of furniture themselves and was therefore copyrightable. Id.

In this case, the ornamental sculptures and carvings in the Grand Inheritance and English Manor designs, including those depicted in Universal Exhibit 3, easily satisfy the conceptual separability test. These designs clearly possess independent artistic expression that can be imagined as existing separately from the pieces of furniture on which they appear. See Collezione, 243 F. Supp. 454-57.

B.      CEU Unlawfully Copied Universal's Copyrighted Works.

In addition to proving ownership of a valid copyright, a copyright infringement plaintiff must prove that the defendant engaged in copying. See, e.g., Towler, 76 F.3d at 581; Baldine, 956 F. Supp. at 585. Copying can be proved either "directly" (i.e., with direct evidence that the infringer copied the work at issue) or "circumstantially" (i.e., by showing that the alleged infringer had access to the work and that the resulting work is substantially similar to the copyrighted work). See, e.g., Bouchat, 228 F.3d at 492; Towler, 76 F.3d at 581.

In the prior Collezione case, CEU admitted to operating under a business model grounded on knocking off the furniture designs of its competitors. See also Giles Decl. at ¶ 12. Like most cases,

13

however, the evidence of CEU's unlawfully copying in this instance is circumstantial, based on CEU's access to Universal's copyrighted works, and CEU's creation of designs and design compilations that are substantially similar to those works.

CEU clearly had access to the publicly available Grand Inheritance and English Manor Designs. Furniture products bearing these Designs have been distributed to the public since 2001 and 2002, respectively. Id. at ¶¶ 7, 9. CEU even displayed such furniture products of Universal in CEU's showroom. Id. at ¶ 15.

As to "substantial similarity," the Fourth Circuit described the governing test as follows:

> First, a plaintiff must show – typically with the aid of expert testimony – that the works in question are extrinsically similar because they contain substantially similar ideas that are subject to copyright protection. Second, a plaintiff must satisfy the subjective, or intrinsic, portion of the test by showing substantial similarity in how those ideas are expressed [from the perspective of the intended audience].

Towler, 76 F.3d at 583-84. Further, in Lyons Partnership v. Morris Costumes, 243 F.3d 789, 801 (4th Cir. 2001), that court observed, "The notion of intrinsic similarity can be a slippery one because it requires the court to inquire into 'the total concept and feel of the works,' but *only* as seen through the eyes of the ordinary observer." 243 F.3d at 801 (emphasis in the original). The Second Circuit's Tufenkian decision clarified this part of the substantial similarity test:

> Essentially, the total concept and feel locution functions as a reminder that, while the infringement analysis must *begin* by dissecting the copyrighted work into its component parts in order to clarify precisely what is not original, infringement analysis is not *simply* a matter of ascertaining similarity between components viewed in isolation. For the defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art – the excerpting, the modifying, and arranging of public domain composition, if any, together with the development and representation of wholly new motifs . . . are considered in relation to each other. The court, confronted with an allegedly infringing work, must analyze the two works closely to figure out in what respects, if any, they are similar, and then determine whether these similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking.

14

338 F.3d at 134.

In assessing substantial similarity, courts focus on the similarities between the designs, not on the differences, except to the extent the differences reveal a "consciousness of guilt." Courts are wary of the fact that changes can "sugges[t] defendants may have deliberately eliminated elements so as to avoid a determination of copying." Thimbleberries, 142 F. Supp.2d at 1140-41; see also Atari, 672 F.2d at 619 ("superficial changes" may be seen as "an attempt to disguise an intentional appropriation.") Such is the relevance of CEU's superficial changes to its knock-offs in this case . CEU has made a minimal effort to depart, in a few isolated respects, from the Grand Inheritance and English Manor designs that CEU plainly copied. Such *de minimis* alterations plainly buttress Universal's substantial similarity argument because they confirm the intentionality of CEU's decision to copy Grand Inheritance and English Manor without authorization. See Moser Decl. at ¶ 29.

As demonstrated by photographic evidence, see Universal Exhibits 3-5, and by expert testimony, see Moser Decl. at ¶¶ 27-28, many of the design elements in the parties' competing collections appear extraordinarily similar to one another. In addition, CEU's 20000 and 20200 knock-offs are also substantially similar to the copyrightable compilations of design elements that appear in Grand Inheritance and English Manor. Id. at ¶¶ 30-33; see Universal Exhibits 3-5.

The designs of CEU's 20000 and 20200 collections are strikingly similar to the Universal collections, both at the broad level of each overall design and at the detailed level of particular design elements. Moser Decl. at ¶¶ 25-31. Given these striking similarities, it is inconceivable that CEU's collections could have been created without Grand Inheritance and English Manor, or substantially similar reproductions, as their virtually exclusive reference points. Id. at ¶ 32.

15

The manner in which CEU developed its knock-off of English Manor is particularly telling. First, in October 2004, CEU displayed actual pieces of Universal's English Manor collection in CEU's showroom. Giles Decl. at ¶ 15. In other words, rather than creating a design based on copying English Manor. Collezione obtained actual pieces of English Manor, and displayed those pieces in its showroom as if they were CEU's own furniture.[2] Id. When Universal's attorneys objected to such conduct, CEU agreed, without prejudice, not to market or sell its competing 20000 and 20200 collections while the parties, through counsel, engaged in settlement negotiations in an effort to reach a satisfactory resolution. Id. at ¶ 17. Those settlement efforts continued until mid-March, 2005, when Universal learned from *Furniture Today* that Collezione was once again marketing the 20000 and 20200 collections. Id. From late October 2004 until mid-March 2005, Universal believed, based on statements made by CEU's attorney, that CEU had at least temporarily ceased distribution of its 20200 and 20000 collections. Id. Nevertheless, CEU's 20000 and 20200 collections, as depicted in *Furniture Today*, were strikingly similar to the corresponding Universal collections. Id.

Such clear copying – by a company that this Court has previously found liable for copyright infringement for knock-offs of a competitor's furniture – is final confirmation that Universal is likely to succeed on the merits of its copyright infringement claim. Id. at ¶ 12.

_____

[2] In addition to its claim for copyright infringement, Universal has asserted against CEU causes of action for "unfair competition," and/or "unfair and deceptive trade practices," arising under Lanham Act § 43(a), N.C. Gen. Stat. § 75-1.1, and North Carolina common law. These three claims all arise out of the same operative facts, namely, CEU's displaying in CEU's showroom of furniture products manufactured by Universal, and CEU's consequent attempts to pass off Universal's products as though they were CEU's. See Giles Decl. at ¶ 15. Such conduct establishes Universal's likelihood of succeeding on the merits of such additional claims. See e.g., Sublime Prods., Inc. v. Gerber Products, Inc., 579 F. Supp. 248, 250 (S.D.N.Y. 1984)(citing L'Aiglon Apparel v. Lana Lobell, 214 F.2d 649 (3d Cir. 1954) and American Optical v. Rayex Corp., 266 F.2d 342 (S.D.N.Y. 1966)).

16

**III.    Universal is Presently Suffering Irreparable Injury, and Will Continue to Do So.**

CEU's unlawful conduct is causing Universal irreparable harm, and such damage will persist during the pendency of this litigation unless a preliminary injunction is issued. "In copyright-infringement cases, the general rule is that a showing of a *prima facie* case raises a presumption of irreparable harm." Taylor Corp. v. Four Seasons Greetings, LLC, 315 F.3d 1039, 1042-43 (8th Cir. 2003)(citing Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1254 (3rd Cir. 1983), cert. denied, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984)). Thus, the strength of Universal's copyright infringement claims establishes irreparable injury.

However, Universal need not rely solely on this presumption of irreparable injury. Instead, the record is replete with independent evidence of the irreparable damage it has suffered due to CEU's infringing acts. First, because CEU bypassed the expensive design process that Universal underwent, CEU does not have to recoup those costs and can charge much lower prices for its furniture. Giles Decl. at ¶ 18. Indeed, CEU is believed to charge $500 less than Universal's English Manor bedroom and $150 less than Universal's English Manor dining room furniture. Id. Thus, by copying Universal's designs without paying any part of the costs for the development of such designs, CEU is receiving a subsidy directly from Universal, thereby gaining a competitive advantage to which CEU is not entitled. Id. Such disparities in price have been recognized as a "sufficient indicator of irreparable harm to [a copyright infringement] plaintiff's reputation . . . to warrant [a preliminary injunction]." Judscott Handprints, Ltd. v. Washington Wall Paper Co., Inc., 377 F. Supp. 1372, 1380 (E.D.N.Y. 1974).

In addition, CEU's copying of Universal's designs and its corresponding conduct in the marketplace threaten to weaken Universal's established relationships with important customers. Giles Decl. at ¶ 18. The impact of that weakening will be very difficult to gauge, because it will

17

consist not only of sales directly lost to CEU, but also of the various kinds of concessions and accommodations that Universal is forced to make to keep its customers. Id.

Moreover, the health of the furniture industry requires legal protection for the intellectual and creative work of the type that went into the Grand Inheritance and English Manor collections. Moser Decl. at ¶ 35. Furniture manufacturers and the furniture industry as a whole invest enormous resources in creating designs they hope will appeal to consumers. Id. If the fruits of one's creative and intellectual labors simply become free for the taking, companies and individuals will quickly realize that there is nothing to be gained by investing in the creative process. Id. Such commercial damage justifies the entry of a preliminary injunction.[3]

## IV.    CEU Will Not Be Harmed If a Preliminary Injunction is Entered.

Given the nature of the injuries Universal has suffered, and will continue to suffer, it is extremely difficult, if not impossible, to calculate the damages Universal will incur absent an injunction. Those damages, however, significantly outweigh whatever costs CEU may face in complying with the injunction. CEU's continuing infringements of Universal's copyrights will cause Universal to suffer significant competitive disadvantage in the marketplace, and damage to its reputation and goodwill. By contrast, even if enjoined, CEU may continue to sell and distribute its non-infringing products. In such circumstances, and given Universal's strong showing of a likelihood of success on the merits, this factor weighs strongly in favor of entering a preliminary injunction. See, e.g., Lakedreams v. Taylor, 932 F.2d 1103, 1109 (5th Cir. 1991).

---

[3] Universal has also established irreparable damage arising out of CEU's violations of Lanham Act § 43(a), N.C. Gen. Stat. § 75-1.1, and North Carolina common law prohibiting unfair competition. Similar to instances of copyright infringement, as discussed above, federal courts recognize a presumption of irreparable injury arising out of a plaintiff's showing of a likelihood of confusion under the Lanham Act. See, e.g., E. Remy Martin & Co. v. Shaw-Ross Int'l Imps., Inc., 756 F.2d 1525, 1530 n.14 (11th Cir. 1985).

18

Similarly, the Court should not consider putative harms to CEU stemming from its being required to cease its infringing activities. See, e.g., Callaway Golf Co. v. Golf Clean, Inc., 915 F. Supp. 1206, 1215 (M.D. Fla. 1995)("A preliminary injunction will not cause Defendants to suffer any legitimate harm, because they are simply prevented from selling a product that they are not legally entitled to sell."); Caterpillar, Inc. v. Nationwide Equip., 877 F. Supp. 611, 617 (M.D. Fla. 1994)(finding that "Defendants will suffer no harm from being restrained from doing that which is illegal.").

## V. The Public Interest Would be Served by a Preliminary Injunction.

In this case, granting a preliminary injunction would also serve the public interest. The public plainly has an interest in preserving rights provided by the federal copyright laws, and in preventing the misappropriation of the skills, creative energies, and resources that are invested in original works protected by such laws. See, e.g., id. at 1109; Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1255 (3d Cir. 1983), cert. dismissed, 464 U.S. 1033 (1984). The consequences of not protecting such works would be devastating, both artistically and economically. See Moser Decl. at ¶ 35.

## CONCLUSION

Universal has demonstrated that its Motion for Preliminary Injunction should be granted, and that CEU should be enjoined from further publicly displaying and offering for sale its 20000 and 20200 furniture collections.

19

Respectfully submitted. this the 9th day of May, 2005.

KILPATRICK STOCKTON LLP

George L. Little Jr.
   North Carolina State Bar No. 2753
William M. Bryner
   North Carolina State Bar No. 23022
W. Swain Wood
   North Carolina State Bar No. 32037

1001 West Fourth Street
Winston-Salem, NC 27101
336.607.7300 (telephone)
336.607.7500 (facsimile)

Attorneys for Plaintiff
   Universal Furniture International, Inc.

20

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the forgoing **PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** was duly served upon the following persons by depositing a copy thereof with the United States Postal Service in an envelope addressed as follows:

> Peter J. Juran, Esq.
> Blanco Tackabery Combs & Matamoros, P.A.
> P.O. Drawer 25008
> Winston-Salem, NC 27114-5008
>
> Harry G. Gordon
> Gordon Law Offices
> Independence Center, Suite 302
> 400 West Market Street
> Greensboro, NC 27401

This the 9th day of May, 2005

George E. Little, Jr.

Attorney for Plaintiff
Universal Furniture International, Inc.

KILPATRICK STOCKTON LLP
1001 West Fourth Street
Winston-Salem, North Carolina 27101
Telephone: (336) 607-7300
Facsimile: (336) 607-7500

9198-49184-262161
WINLIB01:1126307.3

Case 1:04-cv-00977-WO-PTS    Document 11    Filed 05/09/05    Page 21 of 21