IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


UNIVERSAL FURNITURE            )
INTERNATIONAL, INC.            )
                               )
     Plaintiff,                )
                               )
     v.                        )          1:04CV00977
                               )
COLLEZIONE EUROPA USA, INC.,   )
                               )
     Defendant.                )


FINDINGS OF FACT AND CONCLUSIONS OF LAW

OSTEEN, District Judge


     The parties in this matter are two competing furniture

companies.  Plaintiff, Universal Furniture International, Inc.

("Universal"), is a Delaware corporation with its principal place

of business in North Carolina.  Universal designs, imports, and

distributes furniture that is manufactured overseas.  Defendant,

Collezione Europa USA, Inc. ("Collezione"), is a New Jersey

corporation with its principal place of business in New Jersey.

Like Universal, Collezione designs, imports, and distributes

furniture.  Collezione, however, is known in the furniture

industry as a company which imitates or knocks-off the designs of

other furniture companies in order to provide lower cost

alternatives to retail stores.  In fact, Collezione's practice in

this regard with respect to two lines of Universal's furniture is

the root cause of this suit. Universal contends that Collezione has not only copied Universal's Grand Inheritance and English Manor collection to such a degree that it infringes upon Universal's copyrights, but also that Collezione displayed pieces of Universal furniture in its showroom and advertising materials in order to promote and sell its own furniture lines referred to as 20000 and 20200. Universal filed suit against Collezione asserting claims of copyright infringement, violation of the Lanham Act, and violation of North Carolina's Unfair and Deceptive Trade Practices Act ("UTPA"). This case was tried as a bench trial. After assessing the merits of the case, the court concludes the following: (1) Collezione infringed upon Universal's copyright, (2) Collezione passed off Universal's furniture in violation of the Lanham Act, and (3) Collezione's violation of the Lanham Act also constitutes an unfair and deceptive trade practice.

## I.   STATEMENT OF FACTS

Sometime in 2000, Plaintiff approached a furniture design firm, Norman Heckler Design, to create a new collection of highly ornamental bedroom and dining room furniture. One of Norman Heckler's designers, Steven Russell, began designing the new collection by referencing 18th and 19th century design elements which include, inter alia, acanthus leaves, volutes, shells, columns, and rosettes. As a result of his efforts, Plaintiff

produced two separate furniture collections, the Grand Inheritance Collection ("GIC") and the English Manor Collection ("EMC"). The GIC was created in 2000 and first introduced to the public in April 2001 during the International Furnishings Market. The EMC was created in 2002 and first introduced to the public during the April 2002 International Furnishings Market.

In order to protect the substantial investment Universal made in the development of these collections,[1] Universal filed for copyright protection. Universal submitted copyright applications for the GIC stating that the pieces of furniture in the collection were derivative works of public domain pieces. Universal sought protection for the decorative sculptural designs on the furniture, the adaptation of preexisting decorative designs, and the compilation of decorative designs on the suites of furniture. Universal followed roughly the same process for the furniture in the EMC, seeking protection for the three-dimensional sculptural designs and two-dimensional designs on the furniture. The U.S. Copyright Office obtained copyright registration for the GIC on May 1, 2003 (with a supplemental registration being filed on July 3, 2003), and on the EMC on November 14, 2003.

---

[1] Universal paid Norman Heckler Design approximately $1.2 million in royalties for the design of these two collections.

3

At one point, Rhodes Furniture was a major purchaser of Universal's GIC and EMC. Universal, however, altered its credit terms during a change in its business operations policy. As a result, Rhodes decided that it would no longer purchase furniture from Universal and sought a substitute. Around August 2004, one of Rhodes Furniture's senior buyers, James Hendrick, approached Collezione about the possibility of supplying a substitute line of furniture to replace the popular GIC and EMC lines. Collezione agreed to supply Rhodes with a substitute furniture line and used Universal's GIC and EMC as a guideline. Collezione claims that it obtained a display set of the new lines from a Chinese manufacturer, Art Heritage, and named two collections as the 20000 and 20200 lines. Collezione's 20000 line was designed to mimic that of Universal's GIC, and the 20200, that of Universal's EMC.

Collezione introduced its 20200 collection at the October 2004 High Point Furniture Market. During this time, Universal employees were informed that Collezione was displaying the same or nearly similar pieces of furniture in its showroom. In response, Steven Giles, one of Universal's representatives, went to Collezione's showroom to inspect the furniture. While in the showroom, Mr. Giles inspected numerous pieces of the 20200 collection which were so similar to Universal's EMC that he believed they were in fact actual EMC pieces. Mr. Giles paid

4

particular attention to an armoire that contained a production sticker on the back of the piece showing a date and the letters "LC." He took photographs of the pieces and returned to Universal's showroom.

After reviewing the photographs of Collezione's furniture, Universal sent Collezione a cease and desist letter claiming that Collezione was infringing Universal's copyrights. Collezione conceded that it intended to sell pieces substantially similar to Universal's two collections before becoming aware that the collections were copyrighted. To avoid a copyright infringement suit, Collezione informed Universal that it was redesigning the two lines in order to make them distinguishable from Universal's models. By letter, Collezione stated that it would show the new designs to Universal for its review prior to marketing them to the public. Collezione then asked furniture designer Aaron Donner to make minor changes to the 20000 and 20200 lines, paying him nothing for his efforts.[2] Once the redesign was completed, Collezione displayed the new pieces at the San Francisco Furniture Market in January 2005 and advertised the two sets in the Furniture Today magazine without providing Universal any notice.

---

[2] Defendant contends that Mr. Donner redesigned the furniture as a favor to the company because Defendant had been generous to him in the past.

Collezione eventually submitted photographs of the new designs to Universal, but failed to mention that it was already marketing the two lines to the public.  Though different, Collezione's newly designed lines continued to appear substantially similar to Universal's.  Accordingly, Universal filed suit.

## II.  ANALYSIS

### A. Copyright Infringement

The court must address two issues presented at trial that fall within the purview of the Copyright Act: (1) whether Universal possesses a valid copyright registration, and (2) whether Collezione infringed upon Universal's copyright by producing furniture that was substantially similar to Universal's GIC and EMC.  For the following reasons, the court holds that Universal does possess a valid copyright in both collections and that Collezione infringed upon that right.

#### 1. Copyright Validity

To establish copyright infringement, a party must prove ownership of a valid copyright and copying of the constituent elements of a work that are original.  <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361, 111 S. Ct. 1282, 1296 (1991).  Collezione contends that Universal's copyrights for the GIC and EMC are invalid on three grounds:  (1) that Universal does not own the rights to the furniture design and, therefore,

6

cannot lawfully register them, (2) the furniture design is not copyrightable because the design elements are either taken directly from the public domain or are not conceptually separable from the functionality of the pieces, and (3) that Universal cannot claim a copyright in a three-dimensional work based on the right to two-dimensional drawings.

### a. Ownership

Under the Copyright Act of 1976, the issuance of a certificate of registration of copyright is prima facie proof of a plaintiff's ownership of a valid copyright. 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."); Serv. & Training, Inc. v. Data Gen. Corp., 963 F.2d 680, 688 (4th Cir. 1992). Once the plaintiff produces a valid registration certificate, the burden of proof shifts to the defendant to overcome the presumption of ownership and validity. M. Kramer Mfg. Co. v. Andrews, 783 F.2d 421, 434 (4th Cir. 1986). During trial, Plaintiff presented certificates of registration for copyrights on both the EMC and GIC.[3] These certificates were issued to Universal in 2003. This shifts the burden from

---

[3] The certificate of registration number for the EMC is VA 1-227-506. The certificate of registration numbers for the GIC are VA 1-169-932 and VA 1-188-951.

7

Plaintiff to Defendant and creates a presumption of validity in favor of Plaintiff. Defendant maintains that it has overcome the presumption of ownership and validity because the Fourth Circuit held as much when it denied Universal's appeal for a preliminary injunction.

Defendant argues that Plaintiff cannot claim ownership in the rights to the design elements on the furniture because those rights belonged to a predecessor company and Plaintiff cannot establish a proper chain of title. The evidence presented by Universal, however, shows that there was in fact a valid "design service agreement" signed on October 1, 1994, between Norman Heckler, the designer of the two collections at issue, and Universal Furniture Industries ("UFI"). This agreement became valid as to Norman Heckler and Universal Furniture Limited ("UFL") through an asset purchase agreement executed between UFI and UFL in 1997. The terms of that agreement transfer all of UFI's intellectual property rights to UFL. It also transfers the rights to all contracts specifically enumerated in the document, listing the design service agreement with Norman Heckler as one of the contracts. The rights to all intellectual property and contracts then fell under the ownership of Universal in 1998 when it merged with UFL. This made the design services agreement with Norman Heckler still valid when Universal contracted with Norman Heckler in 2003 to create the EMC and GIC. Accordingly,

8

Plaintiff presented evidence to establish ownership to the copyrights in question.

## b. Validity

Defendant claims that Plaintiff's copyrights for the furniture designs are invalid for two reasons: (1) all design elements used in Plaintiff's furniture are from the public domain and incapable of being copyrighted, and (2) the design elements are part of the furniture's form, and therefore not conceptually separable from its functionality. Since Plaintiff owns the two registered copyrights in question, Defendant has the burden of proof of showing they are not valid. M. Kramer Mfg. Co., 783 F.2d at 434.

### i. Originality

Defendant first attacks the validity of Plaintiff's copyrights by arguing that the furniture designs lack originality because all of the decorative elements were taken directly from the public domain. The Copyright Act provides protection for "original works of authorship fixed in any tangible medium of expression" including "pictorial, graphic, and sculptural works." 17 U.S.C. § 102(a)(5). This protection seeks to "promote the Progress of Science and useful Arts" by granting to an author the "right to prohibit the copying of the author's intellectual invention, i.e. the originality of an author's expression."

9

<u>Superior Form Builders v. Dan Chase Taxidermy Supply Co.</u>, 74 F.3d 488, 492 (4th Cir. 1996) (citation omitted).

A "[c]opyright does not prevent subsequent users from copying from a prior author's work those constituent elements that are not original -- for example . . . facts, or materials in the public domain -- as long as such use does not unfairly appropriate the author's original contributions." <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 350, 111 S. Ct. 1282, 1290 (1991) (citation omitted). The originality of an author's work is the linchpin to copyright validity and is "the indispensable prerequisite for copyrightability." <u>Lamps Plus, Inc. v. Seattle Lighting Fixture Co.</u>, 345 F.3d 1140, 1146 (9th Cir. 2003) (citation omitted). It is both a statutory and constitutional requirement. <u>Feist</u>, 499 U.S. at 347, 111 S. Ct. at 1288. Originality, as the term is employed in the copyright context, requires "independent creation plus a modicum of creativity." <u>Id.</u> at 346, 111 S. Ct. at 1288. A work does not need to overflow with originality because "[c]opyright protection is available even if the quantum of originality is minimal." <u>Superior Form Builders</u>, 74 F.3d at 492 (citation omitted).

Here, Plaintiff benefits from a presumption of validity because it owns valid copyright registrations. In order to rebut the statutory presumption of validity, a defendant must show that "the plaintiff's work is not original but copied from another's

10

work." <u>Lamps Plus, Inc.</u>, 345 F.3d at 1146 (citation omitted).
Defendant challenged Plaintiff's furniture design by alleging
that it lacked originality because all elements were taken from
the public domain.  Plaintiff claims that its furniture
represents a derivative work or compilation of design elements
that display a significant level of originality and creativity.[4]

    To find originality in a compilation, courts look to whether
an author took "the commonplace and [made] it into a new
combination or arrangement."  <u>Id.</u> (citing <u>United States v.
Hamilton</u>, 583 F.2d 448, 451 (9th Cir. 1978)).  Accordingly, "a
collection of non-copyrightable material may qualify for
protection if original skill and labor is expended in creating
the work."  <u>Apple Barrel Productions, Inc. v. Beard</u>, 730 F.2d
384, 388 (5th Cir. 1984).  Moreover, "[t]he mere fact that
component parts of a collective work are neither original to the
plaintiff nor copyrightable by the plaintiff does not preclude a
determination that the combination of such component parts as a

_____

        [4] Under the Copyright Act, "[t]he subject matter of
copyright as specified by section 102 includes compilations and
derivative works."  17 U.S.C. § 103(a).  The Act defines a
compilation as "a work formed by the collection and assembling of
preexisting materials or of data that are selected, coordinated,
or arranged in such a way that the resulting work as a whole
constitutes an original work of authorship."  17 U.S.C. § 101.
Likewise, a derivative work is "a work based upon one or more
preexisting works . . . [that] may be recast, transformed, or
adapted," and also includes works "consisting of editorial
revisions, annotations, elaborations, or other modifications
which, as a whole, represent an original work of authorship." <u>Id.</u>

separate entity is both original and copyrightable." Id.
(citation omitted).  Originality in terms of a derivative work is
an "undemanding requirement" that "means little more than a
prohibition of actual copying."  Bucklew v. Hawkins, Ash, Baptie
& Co., LLP, 329 F.3d 923, 929 (7th Cir. 2003) (citation omitted);
see also M. Kramer Mfg. Co. v. Andrews, 783 F.2d 421, 438 (4th
Cir. 1986) (The originality requirement is "satisfied if the new
material or expression has . . . a faint trace of 'originality'
and if it provides a 'distinguishable variation.'") (citation and
internal quotations omitted).  According to Judge Posner, "any
more demanding requirement would be burdensome to enforce and
would involve judges in making aesthetic judgments, which few
judges are competent to make."  Bucklew, 329 F.3d at 929.

In order to demonstrate the level of originality and
creativity in the furniture collection, Plaintiff called Steven
Russell to testify.  Mr. Russell is an accomplished furniture
designer who has over 30 years experience in the design industry
since graduating from the Kendall School of Design in 1973.
During trial, he detailed how he created both the GIC and EMC
lines.  Universal assigned Mr. Russell the task of creating
furniture with a traditional design and giving it a more opulent
look.

Mr. Russell researched various sources such as, furniture
stores, antique magazines, books, and other reference materials.

12

He generally started his designs with the basic form of a specific piece, usually a dresser. He then would begin "conceptual doodles" of the pieces, adding decorative elements to the basic shape of the piece. (Trial Tr. vol. 1, 55, May 15, 2007.) Though he referenced numerous public domain sources for inspiration, he drew all the decorative elements incorporated into the furniture design by hand. Once completed, he would alter the design until he had one that would "trip your trigger" or what he considered to be "pretty." (Id. at 56, ll. 2-3.) After creating a design for a piece, Mr. Russell drew finished sketches at a 1/8th scale, which would include detailed shaded depictions of the decorative elements that he added to the furniture.

The detail in Mr. Russell's design meets the threshold requirement for originality and creativity. He often chose to place certain decorative elements, whether they be acanthus leaves, volutes, rosettes, or shells, in areas of the furniture where he had never seen it done. Though many, if not all, of these elements were in the public domain before he created his design, he chose to use them as inspiration for his own original design instead of copying and pasting them on to his work. The result was a set of furniture that exhibited a distinguishable

13

variation from that which he drew inspiration.[5]  Accordingly,
Universal's copyright is valid because its furniture exhibits
"enough expressive variation from public-domain or other existing
works to enable the new work to be readily distinguished from its
predecessors."  Bucklew, 329 F.3d at 929 (citation omitted).[6]

## ii. Conceptual Separability

Defendant also claims that Universal's copyright is invalid
because every aspect of the piece of furniture is utilitarian in
nature, and thus not copyrightable.  The Copyright Act generally
does not provide copyright protection to a "useful article,"
which is defined as an "article having an intrinsic utilitarian
function that is not merely to portray the appearance of the
article or to convey information." 17 U.S.C. § 101.  However,
protection will inure to a useful article if it is considered to
be a sculptural work.  Such an article qualifies for
consideration as a sculptural work "only if, and only to the
extent that, [its] design incorporates pictorial, graphic, or

---

[5] Mr. Russell stated that he "would describe the Grand
Inheritance as kind of the Heinz 57:  I will grab a part from
Chippendale, a part from Sheridan, a part from Hepplewhite, and
try to blend them all in together."  (Trial Tr. vol. 1, 44, May
15, 2007.)

[6] Defendant's act of copying Plaintiff's work should be
evidence of inherent originality, because if such work "has merit
and value enough to be the object of piracy, it should also be of
sufficient importance to be entitled to protection."  Henderson
v. Tompkins, 60 F. 758, 765 (Circuit Court, D. Mass. 1894)
(citation omitted).

14

sculptural features that can be identified separately from, and
are capable of existing independently of, the utilitarian aspects
of the article." Id. Therefore, items such as mannequins,
lamps, and chairs are usually the type of articles that will not
receive the benefit of copyright protection because their design
cannot be separated from their utilitarian function. See
Superior Form Builders, 74 F.3d at 493-94 (stating that "the
industrial design of a unique, aesthetically pleasing chair
cannot be separated from the chair's utilitarian function and,
therefore, is not subject to copyright protection"); Lamps Plus,
Inc., 345 F.3d at 1146-47 (lamp not copyrightable); Carol
Barnhart, Inc. v. Economy Cover Corp., 773 F.2d 411 (2d Cir.
1985) (mannequin not copyrightable). Though this is the
generally accepted rule, there are some cases where the
uniqueness of the design can be separated from the function of
the article, allowing items such as lamps and mannequins to be
the proper subject of copyright protection. See Superior Form
Builders, 74 F.3d at 493-95 (animal mannequins copyrightable);
Mazer v. Stein, 347 U.S. 201, 74 S. Ct. 460 (1954) (lamp
copyrightable).

    In order to determine whether a predominantly utilitarian
object is sufficiently original to warrant a copyright, courts
employ the conceptual separability test. As expressed by the
Fourth Circuit in Superior Form Builders, this test requires that

the work "represents the author's creative effort" and that "the design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences." Superior Form Builders, 74 F.3d 493-94 (citations omitted).

Applying this test to the furniture designs in this case, there is sufficient basis to find that the decorative elements adorning the furniture bear significant originality and are conceptually separate from the furniture's utilitarian function. When Mr. Russell designed the GIC and EMC lines, he began with a standard piece and shaped it to a certain form. For example, Mr. Russell would begin the design for a dresser by giving it certain height and width dimensions, as well as including drawers. At this point in the design process, function was his primary concern because, as Mr. Russell stated, "dressers have got to have drawers," otherwise "you are not going anywhere with it." (Trial Tr. vol. 1, 51, May 15, 2007.)

Once the basic shape of the piece was completed, the functional considerations came to an end. Mr. Russell then used his artistic ability to adorn the pieces with decorative elements. He set out to make something distinctive in the marketplace by giving the furniture a "new look" and bringing "something new to the party." (Id. at 77.) He drew upon inspirational sources to create ornaments, then placed them on

16

the furniture to attain a sophisticated look.  The design,
location, and type of decorative element that Mr. Russell
selected served no functional purpose, but rather served to add a
certain artistic or aesthetic quality to the piece.  It is this
aspect that differentiates Universal's furniture from the typical
"useful article" that deserves no copyright protection.  While
the shape of the furniture cannot be the subject of a copyright,
no matter how aesthetically pleasing it may be, the decorative
elements that are separable from the furniture can be.  This
court, therefore, finds that Universal's copyright is valid.

### c. Dimensional Alteration

Defendant maintains that Universal is not the owner of the
copyright for the furniture because any rights it inherited from
Norman Heckler Design are only in the two-dimensional drawings,
not the three-dimensional pieces of furniture.  Defendant argues
that the rights to the design reside with the manufacturer of the
furniture because the manufacturer takes the two-dimensional
design and transforms it into a three-dimensional object.

The pure reproduction of a design from one medium to another
generally does not meet the threshold originality requirement
necessary for copyright protection.  See L. Batlin & Son, Inc. v.
Snyder, 536 F.2d 486, 491 (2d Cir.) (en banc), cert. denied, 429
U.S. 857, 97 S. Ct. 156 (1976) (In order to qualify for copyright
protection, a work must display "some substantial variation, not

17

merely a trivial variation such as might occur in the translation to a different medium."). In Durham Industries, Inc. v. Tomy Corp., 630 F.2d 905 (2d Cir. 1980), the court was faced with the question of whether the mere reproduction of Disney characters into plastic wind-up toys involved sufficient originality to merit copyright protection. In concluding that it did not, the court referenced previous precedent that rejected "the contention that the originality requirement of copyrightability can be satisfied by the mere reproduction of a work of art in a different medium, or by the demonstration of some 'physical' as opposed to 'artistic' skill." Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 910 (2d Cir. 1980) (citing L. Batlin & Son, Inc. v. Snyder, 536 F.2d 486 (2d Cir.) (en banc), cert. denied, 429 U.S. 857, 97 S. Ct. 156 (1976)). The court concluded that the mere reproduction of these characters into plastic did not exhibit the requisite level of originality required for a copyright, despite the fact that the author had demonstrated some degree of manufacturing skill. Id.

This court comes to the same conclusion in this case that the Second Circuit reached in Durham Industries. Though both Plaintiff and Defendant agreed that it takes a certain amount of skill to transform the two-dimensional furniture drawings into a three-dimensional production carving, a skill that Mr. Russell even admitted he lacked, such a skill is purely physical and not

18

artistic.  If the court were to conclude that the pure
transformation of a drawing into a three-dimensional object
constituted a sufficient amount of originality for a copyright,
then it would "put a weapon for harassment in the hands of
mischievous copiers" who could severely limit the scope of
copyright protection afforded to the original author simply by
making a copy of an original work in a different medium.  Id.
(citation omitted).  Indeed, the new author could obtain a
monopoly in the three-dimensional work that would significantly
inhibit the original author's ability to market the underlying
work.  Id.  For this reason, Plaintiff, and not the Chinese
manufacturer, is the proper holder of the copyright.

## 2. Infringement

In order for Plaintiff to show that Defendant infringed upon
its copyright, Plaintiff must prove by a preponderance of the
evidence that Defendant copied the original elements of its work.
Feist, 499 U.S. at 361, 111 S. Ct. at 1296.  Rarely will a
plaintiff be able to show through direct evidence that a
defendant engaged in copying.  M. Kramer Mfg. Co. v. Andrews, 783
F.2d 421, 445 (4th Cir. 1986) (citation omitted).  Instead, a
plaintiff can establish copying indirectly by proving that a
defendant had access to the work in question and that the
defendant's version bears a substantial similarity to the
copyrighted work.  Id. (citation omitted).  In this case,

19

Defendant admitted to possessing Plaintiff's furniture and using
it as a model in designing its own.  The court, therefore, will
only address the issue of substantial similarity.

Initially, Defendant designed its 20000 and 20200 lines of
furniture so that they would be nearly identical to Plaintiff's
GIC and EMC in order to offer Rhodes Furniture a substitute for
the furniture it was no longer able to obtain from Plaintiff.
After Plaintiff informed Defendant that its furniture design was
infringing upon Plaintiff's copyrights, Defendant redesigned its
20000 and 20200 line of furniture.  Plaintiff continues to claim
that the redesigned versions stand in violation of its
copyrights.[7]  Defendant argues that the design changes it made in
the furniture were significant enough to avoid infringing upon
Plaintiff's copyrights.  The court, therefore, must determine
whether the newer design of Defendant's 20000 and 20200 models
are substantially similar to Plaintiff's GIC and EMC.

Establishing substantial similarity requires analysis under
a two-part test.  First, the court must determine whether the two
works in question "are extrinsically similar because they contain
substantially similar ideas that are subject to copyright
protection."  Lyons P'ship, L.P. v. Morris Costumes, Inc., 243

_____

[7] On account of the striking substantial similarity between
Defendant's original (pre-redesign) versions of 20000 and 20200,
the court finds that Defendant infringed upon Plaintiff's
copyright.  This, however, leaves a question as to whether
damages are appropriate.

F.3d 789, 801 (4th Cir. 2001) (citation and internal quotations omitted).  Then, the court must decide "whether the works are 'intrinsically similar' in the sense that they express those ideas in a substantially similar manner from the perspective of the intended audience of the work."  Id. (citation omitted).  Making such a determination requires the court to step into the shoes of an ordinary observer and "inquire into the total concept and feel of the works" as viewed by an ordinary observer.  Id. (citation and internal quotations omitted); see also Durham Indus., 630 F.2d at 911-12 ("Substantial similarity is to be determined by the 'ordinary observer' test.").  Judge Learned Hand defined this test stating that a substantial similarity exists when "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same."  Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960)).

        The two collections of furniture in this case are extrinsically similar because they express a substantially similar style.  Plaintiff's original derivative design of the furniture pieces in both the EMC and GIC reflects a highly decorative appearance with a traditional feel.  Defendant's design contains an overall look and feel that mirrors that of Plaintiff's.  Both parties' collections are characterized by very ornamental designs combined with basic styles that resemble

21

furniture pieces from England in the 18th or 19th centuries.  The
overall feel, color, shape, and dimensions of the pieces are also
substantially similar.

At the intrinsic level, the pieces need to be analyzed
individually to determine whether an ordinary observer would see
each piece the same, discounting any trivial differences.  The
court, therefore, will make side by side comparisons to each
piece.[8]

### a. GIC v. 20000

### i. Chairs

Plaintiff's GIC chairs and Defendant's 20000 chairs exhibit
numerous similar qualities.  Both are shaped in an identical
manner with claw feet and grooved armrests that end in a volute.
The chairs are not substantially similar, however, with respect
to the carved pattern serving as the chair back.  In fact, the
pattern is quite a distinguishable disparity that an ordinary
observer would be unable to overlook.  Accordingly, Defendant's
chair design does not infringe upon Plaintiff's copyright.[9]

### ii. Rectangular Tables

The rectangular tables in the GIC and 20000 collection
exhibit many of the same qualities.  The detailed inlay of the

---

[8] The court bases its analysis on the furniture pieces using
Defendant's Trial Exhibit No. 1.

[9] This conclusion is the same for the side chair in each
collection as it is for the arm chair.

table top is identical, as is its shape. Both are marked by a carved pattern on the table's apron. Here, the similarities cease. The two tables are readily distinguishable by the remarkably different styles of the pedestals. The 20000 pedestal is boxy with an acanthus leaf carving on each supportive pilaster. The GIC table top, on the other hand, is supported by an urn-like pedestal that sits on a triangular base. This design gives the GIC table a more elegant feel and distinguishes it in a manner that an ordinary observer would not confuse. Accordingly, Defendant's table does not infringe upon Plaintiff's copyright.

### iii. China Cabinets

The china cabinets in the GIC and 20000 collection are nearly identical. Both are exactly the same shape, height, and color. From an average viewing distance, the carved moldings, flowers atop the pilasters, and designs on the railings are substantially similar. Though the pediments on the two pieces are not identical, they both exhibit arches adorned with acanthus leaves and centered with a shell-like design. Overall, the two pieces are substantially similar and Defendant's version contains the placement of similar design elements in a location on the furniture that is identical to the pattern created by Plaintiff. The slight variations in the pieces are not of a degree that would cause an ordinary observer to conclude that they exhibit

23

distinguishable differences.  Accordingly, Defendant's china
cabinet design infringes upon Plaintiff's copyright.

### iv. Sideboards

Defendant's sideboard is nearly identical to Plaintiff's
design.  They share the same shape, color, and overall feel.
Both have decorative elements in the same places with carvings,
such as the rosette atop the pilasters and molding around the top
railings, that are nearly indistinguishable.  There are matching
inlays in the side doors bordered by matching carved moldings.
Though the pilaster designs are not the same (one is grooved and
the other flat), the difference would not stand out to the
ordinary observer.  Accordingly, Defendant has infringed upon
Plaintiff's copyright on this piece.

### v. Headboards and Footboards

The headboards and footboards present an interesting
question to the court because there are some decorative elements
that are substantially similar and others that are not.  The bed
posts, for example, are the same shape and are topped with nearly
identical urns.  Below the urns are similarly carved moldings.
To an ordinary observer, these features would be substantially
similar.  The headboards and footboards, however, display a
difference.  Defendant's headboard features a centered column,
while Plaintiff's is a plain design.  The top of Defendant's
headboard is adorned with a shell design attached to acanthus

24

leaves that extend across the headboard to the posts.
Plaintiff's headboard also displays a centered shell with
attached acanthus leaves, but this design does not extend to the
posts.  Instead, it is interrupted by a plain rail that rejoins
an acanthus leaf design attached to the two posts.  The same
analysis applies equally to the footboard design.

When viewed in totality, however, the simple addition of a
column and the extension of decorative acanthus leaves along the
headboard are not sufficient to distinguish Defendant's design
from that of Plaintiff's.  To an ordinary observer, the pieces
still remain substantially similar because Defendant mimicked
Plaintiff's placement of decorative elements.  Accordingly, the
court finds that Defendant's headboard and footboard designs
infringe on Plaintiff's copyright.

### vi. Dressers

Defendant's dresser design also presents an interesting
question in the substantial similarity analysis.  In this case,
the dresser is the same size and shape of Plaintiff's dresser,
and it is designed with the same placement of decorative elements
that can be found on Plaintiff's dresser.  The only immediately
distinguishable design element in Defendant's dresser is the fact
that Defendant has replaced the three middle horizontal drawers
with two vertical doors that presumably open to a shelved area.
Since the copyright extends to the decorative elements and their

25

placement, and not the functionality of the piece, then the difference in drawer selection is irrelevant. Therefore, the fact that Defendant uses substantially similar pilasters on the corners of the dresser, along with very similar leaf designs on the dresser's feet and similar rosettes and carved moldings on the top of the dresser, makes the two pieces indistinguishable under the ordinary observer test. Accordingly, Defendant has infringed upon Plaintiff's copyright in the dresser.

### vii. Chests of Drawers

Though not identical, Defendant's chest of drawers bears a substantial similarity to the chest of drawers designed by Plaintiff. The differences in design between Plaintiff's and Defendant's pieces are negligible when considering the pieces as a whole under the ordinary observer test. Both pieces feature pilasters that run vertically on the front side edges of the frame. The pilasters are topped with similar rosettes. The chests both exhibit a carved molding just below the frieze rail at the top of the piece and ogee feet at the bottom decorated with volutes and leaf carvings. Though there is not a break in Defendant's design distinguishing a set of drawers as there is in Plaintiff's, the style, placement, and type of decorative elements in Defendant's chest of drawers are substantially similar to those of Plaintiff's. Accordingly, Defendant has

26

infringed upon Plaintiff's copyright with respect to this piece
of furniture.

### viii. Nightstands and Armoires

The analysis for Defendant's nightstand and armoire is the
same as that of the chest of drawers.  These pieces are
additional examples of instances where the minute differences in
detail would be overlooked by an ordinary observer.  Each
decorative design element used in Plaintiff's nightstand has a
corresponding design element in the same location on Defendant's
nightstand.  For example, Defendant's and Plaintiff's nightstands
both display pilasters on each side decorated with volutes and
topped with rosettes.  They both display a carved molding around
the top of the piece and ogee bracket feet decorated with leaf
carvings.  Such striking resemblances would lead an ordinary
observer to conclude that they were substantially similar.

The armoire shares the same design layout as the nightstand
because the bottom of the armoire is designed to match the
nightstand.  The top half of Defendant's armoire incorporates the
same pilaster placement and design used in Plaintiff's armoire.
Additionally it also uses the same style molding on top.
Defendant's nightstand and armoire, therefore, infringe upon
Plaintiff's copyright.

27

### ix. Mirrors

Defendant's mirror is perhaps the closest to being an exact duplicate of any of the other pieces in this collection. Like Plaintiff's mirror, Defendant's is designed with a shell in the center of the mirror's top. From the shell, there are acanthus leaves that begin in a volute and emanate outward, ending approximately halfway to each upper corner. The upper corners of the mirror are marked by leaf carvings and the lower corners contain acanthus leaves and volutes. The bottom of the mirror has a carved molding design and the mirror's glass is surrounded by bead work. Plaintiff's mirror is laid out in exactly the same fashion, making Defendant's mirror substantially similar to that of Plaintiff's. Accordingly, Defendant's design infringes upon Plaintiff's copyright.

### b. The English Manor Collection and 20200

Defendant undertook significantly less effort with respect to redesigning the 20200 collection than it did with its 20000 collection because each piece in the set is substantially similar to its corresponding piece. Though it is true that much of Plaintiff's design resembles that in the public domain, Plaintiff's designer drew upon the original sources for inspiration in creating the furniture. This, however, is where Defendant erred. While Defendant was free to utilize the same public domain sources used by Plaintiff to draw inspiration and

28

create its own design, it was "not free to copy the copy."

Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 249, 23
S. Ct. 298, 299 (1903) (citation omitted); see also Superior Form
Builders, 74 F.3d at 492. Accordingly, the court finds that the
entire 20200 collection has infringed upon Plaintiff's copyright
for the EMC.

**B. Lanham Act Claim**

Plaintiff contends that Defendant displayed actual pieces of
Plaintiff's EMC in its showroom during the High Point Furniture
Market and passed them off as Defendant's 20200 collection in
violation of the Lanham Act. The Lanham Act prohibits a "false
designation of origin . . . which is likely to cause confusion,
or to cause mistake, or to deceive as to the affiliation,
connection, or association of . . . the origin, sponsorship, or
approval of [one's] goods, services, or commercial activities by
another person." 15 U.S.C. § 1125(a)(1) (2007). Included within
the gambit of the Lanham Act is the prohibition of "reverse
passing off" or "reverse palming off" of goods. See Dastar Corp.
v. Twentieth Century Fox Film Corp., 539 U.S. 23, 123 S. Ct. 2041
(2003). A reverse passing/palming off occurs when a "producer
misrepresents someone else's goods or services as his own." Id.
at 27, 123 S. Ct. at 2045, n.1 (citation omitted). Liability for
reverse passing off also exists when a defendant "sell[s] or
offer[s] for sale another's product that has been modified

29

slightly and then labeled with a different name." <u>Roho, Inc. v. Marquis</u>, 902 F.2d 356, 359 (5th Cir. 1990) (citing <u>Arrow United Indus., Inc. v. Hugh Richards, Inc.</u>, 678 F.2d 410, 412, 415 (2d Cir. 1982)). These actions "have both been recognized as wrongful because they involve attempts to misappropriate another's talents." <u>Id.</u> at 359 (citation omitted). As a consequence, the act of reverse passing off deprives "the originator of the misidentified product . . . of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product." <u>Id.</u> (citation omitted).

Plaintiff's claim is that Defendant offered its EMC furniture by way of displaying it at the furniture market as if it were part of Defendant's own line, called 20200. This places the burden on Plaintiff to show that the actual pieces of furniture displayed by Defendant were in fact those of Plaintiff. <u>Tao of Sys. Integration v. Analytical Servs. & Materials, Inc.</u>, 299 F. Supp. 2d 565, 572 (E.D. Va. 2004). In order to recover against Defendant, Plaintiff must prove (1) that the furniture at issue originated with Plaintiff; (2) that Defendant falsely designated the origin of the furniture; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that Plaintiff was harmed. <u>Syngenta Seeds, Inc. v. Delta</u>

30

Cotton Coop., Inc., 457 F.3d 1269, 1277 (Fed. Cir. 2006) (citing Lipton v. Nature Co., 71 F.3d 464, 473 (2d Cir. 1995)).

### 1. Origin of Furniture

In order to proceed against Defendant for a reverse passing off claim under the Lanham Act, Plaintiff must show that it is the source or origin of the furniture. According to the Supreme Court, "the most natural understanding of the 'origin' of 'goods'--the source of wares--is the producer of the tangible product sold in the marketplace." Dastar, 539 U.S. at 31, 123 S. Ct. at 2047. This can also include "not only the actual producer, but also the trademark owner who commissioned or assumed responsibility for ('stood behind') production of the physical product." Id.

In this case, Plaintiff is not the actual manufacturer of the furniture in question, but can be viewed as its producer. Plaintiff's sister company, Lacquercraft, manufactures the EMC line exclusively for Plaintiff. Plaintiff, in turn, holds the copyrights for all the designs and manages and markets the furniture line. The badging and branding of the furniture is solely the responsibility of Plaintiff, and all of the furniture in the EMC line is initially distributed through Plaintiff. Accordingly, Plaintiff is the producer of the EMC furniture and will be considered the "origin" despite the fact that it is not the direct manufacturer.

31

A dispute exists as to whether the furniture in Defendant's showroom was actually that of Plaintiff. Plaintiff claims that the furniture in Defendant's showroom came directly from Plaintiff because the pieces on display were identical to those Plaintiff sold. Plaintiff presented photographic evidence of the furniture that was in Defendant's showroom in October 2004. These photographs were taken by Stephen Giles, an employee of Plaintiff. Mr. Giles was motivated to inspect and photograph Defendant's furniture after being informed at the furniture market that Defendant was marketing the same or similar furniture as Plaintiff.

In addition to photographing the display samples, he looked for lot control stickers and opened drawers on some of the items. Mr. Giles, who is intimately familiar with Plaintiff's EMC furniture, was thoroughly convinced that the furniture on display in Defendant's showroom was Plaintiff's. He noted that the finishes were the same, as were the lines, stringing,[10] grills, glass, and drawer construction. Additionally, he noticed that the lot control stickers on the back of two pieces were exactly the same as the ones he had designed for Plaintiff. Mr. Giles' testimony was very persuasive to the court, especially when supported by the photographic evidence produced at trial. The

---

[10] Stringing is the term for the thin lines of inlay used for decorative ornamentation on furniture.

32

photographs admitted into evidence depict the furniture that
Defendant displayed as its 20200 collection in its showroom
during the 2004 High Point Furniture Market.  A close analysis of
the photographs shows that each piece of Defendant's 20200
furniture with the exception of the small china cabinet, is
identical to that of Plaintiff's EMC furniture.[11]

The first photograph displays a mirror atop a serpentine
dresser.  Comparing this photograph to Plaintiff's EMC catalog,
the two pieces of furniture are obviously the same.  The tops of
both mirrors have the same curved design adorned with acanthus
leaves.  In the middle of the curved design are grooved
pedestals.  Both mirrors are flanked by identical pilasters and
grooved moldings around the glass.  They are the same size,
shape, and color.  There is absolutely no distinguishing
characteristic between the two pieces, they are the same.
Likewise, the dressers upon which the mirrors rest are
indistinguishable.  The shape of the pieces is identical, as is
the stringing around the drawers, the gadrooned molding along the
top of the pieces, and the drawer hardware.

Plaintiff also submitted photographs showing that
Defendant's headboard is identical to Plaintiff's headboard.
Photographic comparisons show that every decorative detail is the

---

[11] The court utilized Plaintiff's Exhibit Nos. 5 and 7 to
make the comparisons under the Lanham Act claim.

same.  The double shell atop the center of the headboard, as well as the carved molding, upward rising acanthus leaves, and urns resting on the posts, is exactly the same.  The shape of the headboards and the stringing along the moldings are also unmistakably identical.[12]  The armoire, marble top nightstand, serpentine credenza, large china cabinet, and dining tables (both rectangular and round) that Defendant displayed in its showroom are all identical to Plaintiff's corresponding EMC pieces as well.  Not only are the overall size, shape, and color of each piece the same, but the placement of the decorative elements and elements themselves are also the same.

The fact that all pieces described above are exactly alike is reinforced by the trial testimony.  During trial, Defendant could point to only the small china cabinet in the EMC line as not being identical.  For the other pieces, Defendant called one of its employees, James Hendrick, to testify as to the differences in the furniture.  Mr. Hendrick was formerly an employee of Rhodes Furniture and worked as a furniture representative for Defendant.  The testimony he offered as to the comparisons of the furniture was not as persuasive as that offered by Plaintiff.

---

[12] There was not a photograph submitted of the footboard. Accordingly, the court cannot make a determination as to that piece.

34

## 2. Misrepresentation of Origin

Misrepresentation of the origin of a product "can occur either expressly, when the wrongdoer removes the trademark of another and sells that product under a name chosen by the wrongdoer, or impliedly, when the wrongdoer simply removes or otherwise obliterates the name of the manufacturer or source and sells the product in an unbranded state." Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090 (W.D. Wash. 2004) (citing Shaw v. Lindheim, 919 F.2d 1353, 1364 (9th Cir. 1990)). In this case, Defendant displayed pieces of Plaintiff's furniture that were either unbranded or had the labels removed. Defendant marketed the furniture as either its own collection or a collection manufactured by Art Heritage for Defendant instead of crediting Plaintiff with the design of the collection. Though Defendant claims that Art Heritage manufactured the furniture, it produced no material proof or documentation as to where these samples originated. Since the court has found that the pieces of furniture in Defendant's showroom were those of Plaintiff, a conclusion that Defendant misrepresented the origin of this furniture is appropriate.[13]

---

[13] This conclusion is also supported by the testimony from Mr. Giles who stated that he inspected furniture pieces by pulling out drawers, and noticed that there were areas indicating that labels had been removed.

35

### 3. Consumer Confusion

Plaintiff claimed that Defendant's display of the EMC furniture caused confusion among consumers as to whether Defendant was authorized to sell that line of furniture. In order to prove a Lanham Act violation for reverse passing off, a plaintiff must show "a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." Liz Claiborne, Inc. v. Mademoiselle Knitwear, 13 F. Supp. 2d 430, 444 (S.D.N.Y. 1998) (citation and internal quotations omitted). This requirement exists because the "likelihood of confusion is the essence of [a Lanham Act] claim." Johnson v. Jones, 149 F.3d 494, 502 (6th Cir. 1998) (citation omitted). When a case involves a situation where "the defendant has taken the plaintiff's product and has represented it to be his own work[,] [i]t is difficult to imagine how a designation of origin of a product could be more false, or could be more likely to cause confusion or mistake as to the actual origin of the product." Id. at 503.

In Johnson v. Jones, the plaintiff brought suit against an architect for taking the plaintiff's plans, removing the identifiers and replacing them with his own, and then using the plans as though they were his own. Id. The Sixth Circuit affirmed the district court's finding of consumer confusion,

stating that the analysis in situations where the defendant directly takes the plaintiff's product and markets it as his own is "much simpler" because there are few cases "demonstrating a more obvious and imminent likelihood of confusion." Id.

This case is in the same category of misrepresentation as that of Johnson. Here, Defendant displayed Plaintiff's furniture in an effort to sell an identical copy to customers at a lower price. In fact, it was customer confusion that first led Mr. Giles to investigate the furniture in Defendant's showroom. It would be difficult to fathom a situation where a customer would not be confused by seeing two different companies marketing the same furniture under different names. The court, therefore, finds sufficient customer confusion exists.[14]

### 4. Harm to Plaintiff

Plaintiff suffered harm from Defendant's display of the EMC furniture in the form of lost profits. By displaying the same furniture as Plaintiff and offering it for a significantly lower price, Defendant deprived Plaintiff of the opportunity to earn sales and profits. Plaintiff also suffered harm from Defendant's act of depicting the furniture in its salesman's shots advertisements, as those photographs were used to generate

---

[14] The same analysis supports a conclusion by the court that Defendant's act of photographing the furniture in its showroom that originated with Plaintiff constitutes reverse passing off in violation of the Lanham Act. See Matsushita Electric Corp. v. Solar Sound Systems, Inc., 381 F. Supp. 64 (S.D.N.Y. 1974).

furniture sales that benefitted Defendant and not Plaintiff. Accordingly, the court finds that Plaintiff has completely satisfied all elements required to prove a violation of the Lanham Act for reverse passing off.

### C. Unfair and Deceptive Trade Practices

Plaintiff's claim for unfair and deceptive trade practices arises from the same set of facts as that of its Lanham Act claim. Since North Carolina's Unfair and Deceptive Trade Practices Act ("UTPA") prohibits the same type of activity that the Lanham Act prohibits in this case, the court finds that Defendant has violated the UTPA. See Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987).

### III. Damages

The court finds that Defendant is liable to Plaintiff on the following grounds: (1) false designation/reverse passing off of Plaintiff's furniture in violation of the Lanham Act; (2) infringement of Plaintiff's copyright in violation of the Copyright Act; and (3) reverse passing off of Plaintiff's furniture in violation of North Carolina's Unfair and Deceptive Trade Practices Act. For the purposes of calculating damages, the court determines the following as to each count:

### Count One: Violation of the Lanham Act

The court finds that Defendant violated the Lanham Act through its act of passing off Plaintiff's furniture in the EMC

38

collection as its own while the furniture was on display in
Defendant's showroom during the High Point Furniture Market in
October 2004.  This conclusion is also applicable to Defendant's
use of the "salesman's shots" advertisement where the furniture
in the showroom was photographed and used as advertisements for
marketing and sales purposes.

The furniture pieces Defendant displayed that are the basis
for liability are the following pieces from Defendant's 20200
collection:  (1) mirror, (2) dresser, (3) headboard, (4) armoire,
(5) marble top nightstand, (6) serpentine credenza, (7) large
china cabinet, and (8) dining tables (both rectangular and
round).  Excluded from this list are the small china cabinet and
footboard.  The court finds that the small china cabinet was not
an exact match to Plaintiff's.  The court does not find that the
footboard was that of Plaintiff because no evidence was submitted
as to that piece.

### Count Two: Violation of the Copyright Act

The court finds that Defendant violated the Copyright Act by
producing pieces of furniture displaying substantially similar
types and arrangements of decorative elements as used in
Plaintiff's furniture.  This conclusion applies to each piece of
furniture in Defendant's 20000 and 20200 collections before
Defendant produced the redesigned versions.  With respect to the
furniture collections after Defendant redesigned them, the court

39

finds that all pieces in Defendant's 20200 collection continue to violate Plaintiff's copyright.  The court finds that the following pieces in Defendant's 20000 collection continue to violate Plaintiff's copyright:  (1) china cabinet, (2) sideboard, (3) headboard and footboard, (4) dresser, (5) chest of drawers, (6) nightstand, (7) armoire, and (8) mirror.  The court finds that the chairs in the 20000 collection, as well as the rectangular table do not infringe upon Plaintiff's copyright.

### Count Three:  Violation of the Unfair and Deceptive Trade Practices Act

The court finds that the actions taken by Defendant that violate the Lanham Act also violate North Carolina's Unfair and Deceptive Trade Practices Act.

### Monetary Determination

At this time, the court makes no determination as to a monetary award.  A hearing to determine damages will be held at a date to be set by the court.

This the 14th day of September 2007.


United States District Judge